The first case for argument this morning is 15-1237 EON Corporation v. Silver Spring Networks. Mr. Lundley, good morning. Thank you, Your Honor. May it please the Court. The underlying question in this case is whether EON's patents directed to a two-way interactive video network for sending video data messages to and from handheld devices are infringed by, of all things, electric power meters. The District Court erred in this case, first and foremost, by delegating to the jury the job of construing the claims. By allowing the jury to decide what the claim terms portable and mobile meant— But you're advocating reversal here, and you rely heavily on O2 micro. Yes, Your Honor. But in O2 micro, what that gets you is a remand, right? Well, Your Honor, as this Court said in Kinetic Concepts, remand is discretionary under O2 micro. I think the question is there should have been a construction, and there's no question under O2 micro that that's true. The question then is should this Court, based on the evidence before it, go ahead and construe the claims, or should it remand for a construction? We think that it should construe the claims. There is no factual dispute about how Silver Springs meters work. The only dispute is a dispute about the meaning of the terms portable and mobile, and this Court is perfectly capable of resolving that dispute. And if this Court were to adopt the construction that we proposed, I think there's no question but that reversal is appropriate. And that construction, is that the one that appears on page 14 of your brief? Yes, Your Honor. It's in the record at 306. And the construction in particular that we proposed is that the terms mean capable of being easily and conveniently moved from one location where operable to another location where operable, and designed to operate without a fixed location. And we think that construction is evident from the face of the patent. The patents repeatedly distinguish portable and mobile from fixed and stationary. They have claims that require fixed and stationary, and different claims that require portable and mobile. I'm sorry. Please. The District Court was troubled by the last clause, the designed to operate without a fixed location. And I can sort of understand why you may have been troubled by that, because it sounds like what you're saying is it has to operate as it is traversing from place A to place B. I think that's not your position. Is that not your position? We are not arguing that it must be operable while moving. I think, frankly, you could read the patent as requiring that. We offered what to us seems a more generous interpretation, which is it has to be designed to be used in different locations, designed to be moved around. Well, that's not quite what that clause seems to say. Operate without a fixed location. It sounds like it is operating in the absence of being in any fixed place. So I think what we intended by that phrase, Your Honor, to mean was that it doesn't have one fixed home in which it operates. It's designed to be used in different places. Now, I think that certainly incorporates the possibility of using while it's in motion. And, frankly, I think the patent contemplated use while it was in motion. But we are not – we don't think that's a requirement, and we are not articulating that as our definition of portable and mobile. Let me ask – go ahead. No, please. What I wanted to say, Your Honor, is that sort of that piece of the definition, I think, is important to understand in ordinary context the way in which we talk about things being portable and mobile or fixed and stationary. So a stationary bike is different than a normal bicycle, not because it can never be moved from place to place. Of course it can, but its intended operation is to sit in one place while the intended operation of a bicycle is to move. As to the district court's failure to construe, it struck me that the district court, in its mark and order, was giving what you could even call a quasi-construction, because the court said, well, I'm going to say that the meaning of these terms is the natural and ordinary meaning of the terms. I am – and then he quotes the dictionary meanings as he understands them and says, I am not going to allow you to argue a meaning that departs from these terms. So it seemed to me it was open to you at any point in the trial that you felt that the other side was wandering outside of the dictionary meanings or a fair construction of the district court dictionary meanings. You could have said, whoa, you're off base. Well, Your Honor, I think – let me first note that that is not required. And this court has repeatedly made clear that once we argue for a claim construction and we are rejected, and the district court expressly says I refuse to construe the claims, that you don't have to object at every time that the issue comes up in the trial. No, but if the district court does give some direction and the other side goes beyond that direction that's given, you can and presumably shouldn't object. Understood, Your Honor. So I think the rule that we don't have to object again at trial is there for an important reason. That is, if you show up in front of a district court and we object to pretty much every piece of evidence they put on on this issue again and again in front of a jury, the district judge is not going to be happy with that move. All we have to do is object by arguing that it should be construed. That said, I think part of the problem is that while the district court said some things that would lead one to believe that he actually agreed with our construction – he said your construction seems right, it just happens to have this non-infringement slant written into it and I'm not going to adopt it – he also said things that opened the door for them to argue a different scope of meaning. So he cited two dictionary definitions, which frankly have different meanings. They attached themselves to one of them and said, in effect, that portable and mobile mean anything that could possibly be moved. They put a law professor on the stand to testify to his understanding of the meaning portable and mobile, which he said was anything that could be moved, including a house. And the problem is precisely – I think it was on cross-examination. You were pushing on him. Absolutely. If a house is moved, would you regard that as mobile? He said, well, if it can be moved, it's moved. I wonder if that – put it this way. In closing argument, I didn't see any argument by your opposing counsel to the effect that you should look at this the same way you would look at a house. So that's correct. We actually were trying to get him to agree that there were some things that weren't portable and mobile and it turned out to be rather hard to do. But in closing argument, what the lawyer for Eon said was the district court said you can define the terms, jury. It's up to you. And then he said, look at the patent. The patent talks about meter reading. Now, the patent actually talks about portable devices being brought by meter readers to the electric meter. If anything, that seems to me a pretty powerful indication that it didn't include electric meters in the definition of portable and mobile devices. But I think the broader point is that none of this belonged before the jury at all. If they wanted to put a law professor on the stand, if they wanted to put the inventor on the stand in a claim construction proceeding and choose to focus on those instead of the intrinsic record, they'd be welcome to do that before the judge. But we shouldn't have a jury trial that's all about claim construction. And when you look at the record, the specification, I think the specification is replete with instances that suggest portable and mobile can't be defined in the way that they implicitly do as anything that can be moved about. So they distinguish portable and mobile from fixed and stationary. There are separate claims that refer to fixed and stationary devices. And under their implicit construction, I don't know what those claims might cover since everything seems to be portable and mobile. The patents talk of, quote, low-cost portable battery-operated milliwatt transmitter subscriber units that may be moved throughout the base station geographical area for reliably performing such functions as meter reading. The units of the patent are supposed to be actively mobile while in the field, specifically, again, for meter reading. They're designed to be, quote— Again, you're not arguing for active mobility as the right construction. No, Your Honor. No, Your Honor. As we said earlier, while I think the patent would certainly be susceptible of that construction, we're arguing for something narrower, which is this is a device that in its ordinary operation is designed to be used in different locations. Let me give you an example. I'm not sure that the line is so clear or that a construction along the lines of what you had suggested leading up the last clause would have made it any clearer. I have an item that's sold as a portable generator in the basement, which is designed to provide power if the power goes out for the house. It's pretty big. It weighs about 170 pounds, but it's moved. It can be moved. If we need to move it to a different location, we can. We might have to get a few people to do it. Would you regard that as portable? Your Honor, I think this is why— They seem to be portable. I think yes, and this is why the last clause of the construction is important. It is portable as opposed to an electric power plant because it is designed to be used in different locations. The idea is that you would use it here, but you could move it and use it somewhere else. You could, but in the typical fashion, you wouldn't. You'd use it for one place. That, I think, would make it a close case under that definition. I agree. In this case, I think there's no question that it's not a close case. These are things that are physically bolted to a house. They're electrically wired into the grid. Bolted? You mean they're locked, I guess. They're locked into the house. Not necessarily bolted as in they're screwed into the foundation or something. Well, I think they are, Your Honor. In fact, the electric meters are attached to the side of the house. They're not freestanding things that can be moved around. They are attached. They are also locked. They're put in one place, and they're designed to stay there for their entire 15-year operable life. The testimony was they are never reused. If you take it out because it doesn't work, it gets thrown away, or we take it back to the lab to see what was wrong with it, but we never reuse it. We never move it from place to place. What the patent is describing are things that are designed to be used in delivery trucks, designed to be used by people who are carrying around a handheld device. That's why they have batteries. You don't need a battery in something that's physically wired into the grid. That's why they have to communicate across different cell networks and reach different cell networks when they can't find one. It's because they're being moved from place to place. And so I think at a minimum, the court's failure to construe the term led to an ambiguity in the meaning of portable and mobile that we had presented before the jury, and O2 Micro says that's simply wrong. Do we have to agree with you on your claim construction argument for you to prevail? Or could we find that the district court properly said these terms have their plain and ordinary meaning and still reverse? You can still reverse, Your Honor. I think if you disagree with the claim construction argument, the standard of review becomes more difficult. The question becomes is there sort of any reasonable evidence from which we could conclude that these things were portable and mobile under the ordinary meaning? And I think the evidence all suggests that they aren't. There is no dispute about how these meters work, that they are physically secured to buildings. They're locked with tamper-proof devices. They're electrically wired into the power grid. Insulation removal is time-consuming, difficult. You can't do it without a certified electrician. They can't be used while they're being moved. They have no battery, which suggests they're not intended to be used while traveling. Customers aren't allowed to move them. They aren't reused. All of that evidence is undisputed in the record, and all of that evidence is evidence from which you could conclude whatever the reasonable, ordinary definition of portable and mobile is, these things aren't it. Could I ask you a question about the transmit order argument? As I read the record, I did not see that you had raised that on 50A. Your Honor, nobody— I mean, even though there was testimony from Dr. Bims that set up that issue, nobody said anything about it at Rule 50A time. Is that right? Am I reading it correctly? That's correct, Your Honor. And we did move generally for a directed verdict. Well, but you have to do better than that. Well, but we didn't. And the reason we didn't, honestly, Your Honor, is that it's not until after trial that their newfound claim construction showed up. Well, but Dr. Bims, I thought his testimony, both on direct and particularly on cross, made it perfectly clear what their theory of infringement was, and that was that there was transmission, but in one direction it did not include data. So, Dr.— So why wasn't it incumbent upon you to make a motion at that point under 50A? Well, so let me first note that Dr. Bims didn't actually say that about Claim 1, which is the issue of the claim of the patent. Dr. Bims testified about Claim 5 of the 491 patent, which was as different language and is directed to one-way and not two-way communication. And that's clear, I think, both at A452 at 61 lines 18 to 24 and at A451 at page 57 lines 5 to 10. And so the district court just misread the record on that point. It read in testimony about Claim 5 as being relevant to Claim 1. In fact, the— You don't think, though, that Dr. Bims' theory of the case was sufficient to put you on notice that this was an issue as to whether—I mean, you—as I read, even in the closing argument, you made nothing of this. So that's right, Your Honor. Even though this would have been a get-out-of-jail-free card had you employed it, according to your theory of the case, it wasn't. So, Your Honor, I think that the reason is there were two sets of claims at issue in the trial. There were two-way data transmission claims, like Claim 1 of the 491 patent, and there were one-way, or so-called receive-only claims. They asserted both of them in trial. And so there was, in fact, evidence and testimony about one-way transmission because there were claims at issue in the case that covered one-way transmission. Now, the jury didn't find for them on those claims that they haven't appealed that decision. But the result is that it was not, frankly, until the J-Mall briefing when anybody figured out that what they were really arguing was that the language transmitting to and receiving from digital data messages meant—receiving digital data messages—but meant transmitting some undefined other thing. And, in fact, Dr. Bims' testimony was the opposite, that digital data messages, such as meter readings, do not flow towards the subscriber unit. That's A452 at page 61, lines 8 to 24. So I think, frankly, they suggest— It was inconsistent with their theory that they don't have to have data. They have to have control signals, but not data. But that is a theory that Dr. Bims articulated with respect to the receive-only claims, Your Honor, and that, I think, is the problem. That's one of the problems. There are other problems. I think the district court's conclusion in rejecting the claim construction argument that they made on J-Mall was that, well, the evidence doesn't foreclose this interpretation. That's just not the right legal standard for claim construction. So, again, we've got an O2 micro problem. And I think the language of the claim is quite clear in this respect. Thank you, Mr. Long. Thank you, Your Honor. You've exceeded your time. We'll restore two minutes for rebuttal. Thank you, Your Honor. Mr. Scardino. Thank you, Your Honor. May it please the Court, Daniel Scardino for appellee Eon. This is a case where the losing parties expert, under a vigorous cross-examination, agreed that the wireless smart meters were portable. It's interesting to me that you start there. Is this with respect to the testimony that you cite on page 30, I guess, of Redd? It is, Your Honor. Okay. Didn't you leave something out? I mean, this sort of thing happens to us on occasion, and in my view, it's pretty troubling. When you say you're—the answer you cite there is I think it's a pretty accurate characterization of what you said. And I think what you cut off, and please correct me if I'm wrong, is that the ellipsis that follows what you take out is it's a pretty indication it's not mobile. It's a pretty good indication it's not mobile. Your Honor, I'm sorry. I was incorrect. That's not the quote that I was talking about. What I was talking about is the quote that's in the record at A593, where during cross-examination, Dr. Almaroff actually said, under pressure, you can carry these things around. Yes, it's portable. So it wasn't where he was talking about mobility. After he made the concession with respect to portable, he tried at first to peddle backwards and say, well, portable and mobile may mean different things. Then, of course, having recalled that his client took the position throughout the case that portable and mobile meant the same thing, and that was in the Court's Markman order, he then tried to make some distinguishing characteristics about mobile. But what we cited that passage for that you just mentioned was not the concession with regard to portable. It was this other quote. We cited that— Well, where's the other—I'm sorry. Sure. Where's the other quote that you're talking that's not in the brief? It's on page 29 of our brief, Your Honor, and it's A593 in the record. Page 88 at the very top. Right. And, Your Honor, that concession, this goes to the sufficiency of the evidence argument, which is really, once you get past the O2 and micro issues, what this appeal is really about. What happened was not only did he make this concession, but the jury heard a whole wave of evidence about how these devices were portable and mobile, frankly, even under Silver Spring's proposed construction. And that evidence was the following. The jury saw a video in which a technician pulled a meter out of its socket and plugged another one back in. This was all in a matter of seconds. You can see that referred to in the record at A590. There was no testimony that the meters themselves were actually permanently bolted in place. In fact, the testimony was that Silver Spring's own fact and expert witness said that the meters were so easily removed from the plug that to deter theft, the end users put a ring around them and locked them down. But when Silver Spring sold the components, they didn't have a lock on them. And the evidence showed that the meters themselves were replaceable and interchangeable in the socket. The jury also heard from Silver Spring's chief technology officer and from Silver Spring's founder and executive vice president, who each testified that these smart meters, which are wireless devices, were plug-and-play and would self-configure and would automatically wake up and connect in the network every time they were plugged in, no matter which socket you plugged them in in the Silver Spring network. Thus, the smart meters were not designed to operate in only a fixed location. They could operate from any location within the network. The jury was shown evidence from Silver Spring's technical documents that this automatic self-configuration figure was built into every smart meter deployed in the Silver Spring network. No matter where a smart meter was plugged into the network, it would automatically wake up and be able to communicate into the network. The jury also heard testimony from EON's expert, Dr. Kaysen, without any objection from Silver Spring, that this type of capability, being able to work from one place in the network and also being able to work from another place in the network, was another way of explaining what was meant by mobile and portable. That's in the record of A634. That is the jury heard testimony, that testimony, that linked directly Silver Spring's proposed construction of being able to work from multiple places in the network with the terms mobile and portable and with Silver Spring's wireless smart meters. Silver Spring's expert, Dr. Almiroth, testified that even if a user intended to leave a mobile device affixed or locked in place for 15 or 20 years, that that intent would not disturb the device's fundamental character as a portable or mobile device. You can see that in the record at A592. Footnote 12 in our briefing catalog is a laundry list of these concessions by Dr. Almiroth. Finally, EON's expert, Dr. Bim, stated without objection from Silver Spring, so the capability needs to be there, but not that it actually has to move. And those last two points bring up two issues that I think are important and weren't really teased out of Silver Spring's briefing until their reply brief. And it's this issue about capability and what does it mean when a claim is drawn to a capability. And the other issue is this proposal to have an intent to use limitation added into these apparatus claims. With respect to capability, this court has held in both Revolution Eyewear and FinGen that claim limitations may indeed be drawn to a capability, like the capability to be moved. And that capability, if that capability is found in the accused devices, then that claim limitation can be met. That's exactly the case here. Both the dictionary definitions that the court said were emblematic of the plain and ordinary meaning begin with the word capable, and even Silver Spring's own proposed construction begins with the word capable. How would you distinguish portable and mobile meters from those that aren't portable and mobile? Portable and mobile, of course, are synonymous under the court's ruling and Silver Spring's proposed construction. So you would distinguish them. This actually came up during the trial. The prior art that they asserted was something called the NetCom system. This really didn't get fleshed out in the briefs. But in this prior art system, the thing that they said were the portable and mobile subscriber units to invalidate the patent were actually fixed radio units that were mounted on top of a pole and connected by a wire to a meter. And that radio unit on top of the pole could only be reached through its GPS coordinates. So you could only communicate with that radio unit if you used that address, and that address was tied to its actual fixed location, just that single location. Unlike Silver Spring's meters, which are plug-and-play devices that can self-configure and automatically wake up no matter where they're plugged in in their network. So that's the distinction, is that under their construction. So your distinction is the way you're defining portable and mobile has to do with where it can be used, not that it can be easily moved and it's not stationary and fixed? No, I think the definition that both parties told the jury about consistently, both experts and both parties used the exact same construction in front of the jury, capable of being easily moved, but they also both qualified that construction by saying, but it doesn't have to be operable while moving. I understand that. Let's put that apart. How does the way you've argued this case distinguish any electric meter attached to any house? Well, it has to be a wireless electric meter, first of all, because these are portable subscriber units. With respect to portable, it has to be a portable subscriber unit. That's what's claimed, and it's a subscriber unit that operates in a wireless network. So you view claim terms through the lens of what one of ordinary skill in the art would bring to the table, and one of ordinary skill in this art would be somebody who understands wireless communication networks and what portability and mobility mean in the context of the wireless communication arts. And I think consistent with Silver Spring's own proposal— You keep referring to definitions of portable and mobile that talk about other features of this unit that are in the patent, but you don't address the stationary and fixed distinction. I fail to understand how your definition of portable and mobile, as opposed to stationary and fixed, would eliminate any electric meters. Well, I don't know that it would eliminate any electric meters, but what it would eliminate are wireless devices that couldn't communicate from multiple places within a network. So you can't distinguish other meters based upon the terms portable and mobile. You're distinguishing them on other words in the patent, like wireless, or whether they can operate and connect up without a specific location. I think that's exactly the point. And in the prior art system, the thing that they said was— If that's the meaning you're inferring to portable, that it can operate wirelessly, how is that a plain meaning of the word portable? It's not just— Wouldn't that have required a claims instruction? Your Honor, it's not just that it can operate wirelessly. It's that it can be capable and easily moved and operate wirelessly from anywhere in the network. In your brief, you were relying significantly on the fact that this is plugged in, as opposed to integrated into the wiring system of the house. Is that fair to say that that's important to your concept of portability? Well, what it's fair to say is that that doesn't necessarily affect the character of the underlying device as a portable or mobile device. Their own expert, Dr. Almaroff, conceded that point during cross-examination. Let me back up and explain what I'm really trying to ask. My own electrical meter, circa 1950 or something, is just part of the wiring system of the house. I assume in order to move it or replace it, you would have to have an electrician come in, cut wires and splice them and take a new unit, if one could be found, and do the splicing and reintegrate it, as opposed to you saying yours is portable. I understand your argument. Because all you have to do is take a plug and stick it into a socket and you're done. Is that essentially your position? Well, first of all, I don't think there was any evidence below that you had to cut any wires to remove any of these meters. I understand. I'm talking about my system. What I'm trying to get at is, I think my electrical meter, you would probably agree, is not portable. Because it's integrated into this wiring system of the house. It's no more portable than the house. That would be an application of the claim limitations in this case to something that I don't understand the character of, because here we were talking about a specific type of wireless smart meter. Can you answer that question, though? Would Judge Bryson's meter, setting aside the wireless thing, because I know you want to refer to that, but that doesn't seem to be part of the definition of portable. And you certainly didn't ask for it to be part of the definition of portable. Is a meter that is wired into the house, even though it was obviously picked up and transported there somewhat easily, portable and mobile? I think you have to apply this capable of being easily moved definition that both parties used to the jury, and understand the other limitations. I think yes, because it's not very hard for the power company to truck one out. You don't have to go to all 10 houses in a row. I'm not sure that I can answer the question without the underlying factual details about that device that you're referencing. Well, I think you have all the details you need. You know what electric meters look like on the side of the house when they're wired into the house. They're not that big. They're like this. They're about the size of a coffee can. That's right, Your Honor. And in fact, if you look in the patent, if we're trying to understand what portable means in the context of being intrinsic record. They're certainly easily moved at one stage. I think you can unplug them from the wall. That's what the evidence was in this case, that these things just plug into a socket and unplug. As a sense, you can unplug, and I take it from the evidence, seems to be that they all plug or unplug. But mine, you can't. Okay. And so what I'm trying to get at is whether you would agree that mine is not portable. If you can't unplug it. If you can't unplug it. If you can't easily move it, then no, it would not be a portable device. Even though it was easy to bring it there in the first place, once you tie it into the house's electrical system, it's not easy to move, right? If it's not easy to move, then it doesn't meet the definition. That's correct, Your Honor. You've all said easy to move a number of times. I don't understand what easy to move is. Is that a jury question? If an individual can easily move it with his own hands? If an expert or a trucking company can move it, that makes it easy to move? You've introduced this sort of ambiguous term, and I guess is it your view that the jury is left to construe what easily move means or not? The jury was left to apply that definition that both parties said was the court's construction, applied to these accused products. And the application of that definition is the province of the jury. That's correct. How does that give us any clear idea what the scope of this property is? Well, first of all, Judge Love, during the marking process, actually said he addressed the parties' positions, and he said, I think I've resolved the parties' claims scope dispute. He cites O2 micro. And after that, Silver Spring never said, wait a second, we still have a dispute here. Then we go all the way to trial. They never say, we still have a claims scope dispute. We need to address some things. There's still an open issue. They never did any of that. And it wasn't really until their opening appellate briefs that they raised O2 micro for the first time. All the while, the judge thinks he's resolved the parties' dispute by issuing, saying that the plain and ordinary means should control, which, by the way, is exactly in accord with this court's recent holding in Summit 6 just a few weeks ago. And in that case, what the court said was that a party's restating of a settled claim construction dispute doesn't raise an O2 micro issue. So the question is, do we have an O2 micro issue or not? If we don't have an O2 micro issue, then all we're left with is, under Silver Spring's proposed construction, is there sufficient evidence to find for the jury to have to find an infringement and to uphold the verdict? And the evidence that I just cited to you, along with Dr. Almaroff's concession that the devices indeed were portable, and when you take that coupled with their concession that portable and mobile are synonymous, which is also a concession with regard to mobile, you have enough evidence to support the jury's verdict. The evidence that you cited from him is more consistent with the notion that these devices can be picked up and carried, not that they're easily detached and reinstalled. I mean, the stuff you cited on page 29 of their experts talks about what you actually quoted to us. One way of characterizing mobile is to say whether it's easily moved. In the broadest sense, you can carry it around. It's portable. But I thought you just agreed that portable and mobile in this context can't be extended out to everything that can be easily carried around because you could have these meters that are wired into the house, can't be easily removed, and they're certainly not portable and mobile. But the jury heard more than just that concession about portable and mobile. They heard all of the evidence that I just recited to you, and in the totality of all of that evidence, the portable and mobile limitations are met. But you're citing on the main portion of your ruling, which I assume is the best evidence you have, doesn't seem to support that definition. If you look at the patent and how the patent describes portable and mobile, and in particular figures 9A and 9B in the patent, describe preferred embodiments of, quote, portable subscriber units. And in figure 9A, it says, and this is in column 10, that that portable subscriber unit can be, quote, integrated into machinery. In figure 9B, that's describing a portable subscriber unit that is a set-top box that's connected to a conventional television receiver that's plugged into a home on the wall, and it sits in your den or your living room, and you use it to do this interactive television application of the invention. Now, that set-top box, the portability feature with respect to that 9B set-top box, and this is at the top of column 11 in the 101 patent, actually says that the portability feature allows it to be, quote, moved next door. So, we know that with respect to the preferred embodiments that are described in the patent, that a portable subscriber unit is something that can sit in one place for a long time and operate, but it also has the capability of being able to be moved next door. Now, with respect to their design for a fixed, to operate in a fixed location part of their proposed construction, where is there any, sorry, I know you want to move on to the other one, but where is there any evidence to suggest that their devices were meant to be moved from one house to another? Sure. As opposed to easily moved to the first location and installed. As I stated, the devices were described by their own fact witnesses as plug-and-play devices. This is unique for... Is there any evidence ever to suggest that these devices, once they're moved, put in a house, can be either moved by the power company, moved by the customer, moved by anybody to a new location and easily reinstalled? Yes, because they would work from anywhere in the location. They could be placed anywhere and they would work. Whether they were reused or removed or not, it doesn't matter because the capability was there. Consistent with Revolution Eyewear... What testimony supports that? Sure. It is in the record at A417. This is Silver Springs Chief Technology Officer and Silver Springs Chief Scientist in the record at A550 both testified that these devices were self-configuring and plug-in... A417? A417. This is where Silver Springs Founder and Executive Vice President is discussing how these devices can self-configure and would automatically wake up as soon as they were plugged in. That means no matter where you take them and put them into the network, they would automatically wake up and be able to work. Also, Silver Springs Chief Scientist at A550 testified in the same way. Now, to the extent that Silver Springs is proposing an intent of use requirement to their design to operate without a fixed location, that requirement to be read into these apparatus claims would be contrary to this court's long-established precedent summarized in the Catalina marketing case, that apparatus claims are infringed regardless of the uses intended by the inventor or the infringer. It would also be contrary to Section 271A of the Patent Act, which doesn't require any intent for a finding of direct infringement. Silver Springs was accused of direct infringement in this case for making and selling an infringing network and its components, including the smart meter. How the end user, the utility, decides to use them, whether they put them in multiple places or move them around, doesn't matter. The capability was there in the accused devices to be easily carried and to operate without moving because they would work from anywhere in the network. Just very quickly, the question that I asked Mr. Lumley about the transmit limitation, you say that they waived that. Yes, sir. His answer to me was that the testimony from Dr. Bims was not pertinent to the claims, I guess it's one or two of the 491 that we're talking about right now, that are at issue on appeal, and therefore that testimony did not, in effect, put the SSN on notice of the argument that would later be made in support of the no data need go downstream argument. The position that Eon took from the very beginning of the case in infringement contentions, in its expert report, in depositions, all throughout the trial, and you've seen the testimony there where Dr. Bims was unequivocal, that in both Claim 1 of the 491 patent and in the infringement read, only data messages only went on the upstream patent. Was that made explicitly with respect to Claims 1 and 2 as opposed to Claim 5? Yes, because when we did the infringement charts and the expert report, there was an element by element analysis for each claim. So, yes, it was made explicit with respect to that. Judge Love also addressed this issue in his reconsideration order, and what he said was that this argument that that testimony was only about Claim 5 is countered by the fact that Dr. Bims said, hey, there are similar components in many of these claims, and I'm going to talk about them all together. And the fact was that differences between upstream and downstream communication path couldn't have been a surprise to Silver Spring because that was in the court's marking orders from other cases and were applied in this case as well, that because of the receive-only receiver limitation in many of the claims, including the claims that were found to be infringed, you had different communication on the upstream and the downstream communication paths. Thank you. Thank you. Thank you. Before you start, could I just ask you the point that your friend was kind of getting to? It just seems like, based on the conversation we've had here today, the line is drawn – is the line drawn between your construction, which says, was it intended to be used in one place or in several locations, or is it capable of being used in several locations? So do you agree that's where the line is drawn, and you're on one end and he's on the other, or is it different? Your Honor, that's a new line that frankly didn't even appear in the appellate briefing, much less below. So they've argued a couple of implicit claim constructions here. Yeah, but it is correct that you used the word intended a number of times in your argument, and he's using the word capable. So assume for a second that he's right, that it's the capability that's at essence here. Why should you prevail? So because, Your Honor, I think the capability still has to be capability to be used in multiple locations over time, and there is no evidence in the record, zero evidence of that. And when Judge Hughes pressed my learned friend on this question, the answer was not, oh, yes, here's evidence of where they reuse it. The evidence was you plug it in once, and it sends a wireless signal to find the network, as any wireless device would have to do. That doesn't mean that it is ever reused. It doesn't mean even that it is capable of reuse. There is no testimony that it is ever reused, and in fact the testimony is all to the contrary. It stays in one place for 15 years, and it's done. Now, I think there's a little bit of a rabbit that went into the hat in the argument you just heard, because a lot of the discussion was not about the actual electric meters themselves, but the communication socket that gets plugged into the broader electric meter. And they have tried at various points to argue that the communication socket, that's really now the portable and mobile thing. But that was not, in fact, what they argued below, and it's not what they presented to the jury. What trial they accused the entire electric meter, not the communication socket that communicates wirelessly, that is in the record at A428, page 98, lines 14 to 17. It's again in the record at A455, page 74, lines 4 to 9. They did that for a very clear reason. They wanted damages from the entire electric meter, not from some small component of the electric meter. They can't turn around and now say that the portable subscriber unit is not the electric meter itself. It's just a small component that goes into the electric meter. Can I ask you this? If we agree with you on the portable and mobile and find that the district court should have granted a JMOL on 491, do we need to reach the downstream transmission? No, Your Honor. If you rule for us on portable and mobile, you do not need to reach either the damages issue, which we haven't talked about, or the 491 issue. And one thing to note on this point is that Mr. Scardino's entire argument started with the premise, once you get past the O2 micro issue, is there enough evidence in the record to gin up a dispute? And I submit that you don't get past the O2 micro issue. It strikes me that, and this happens a lot, that even if you had gotten the construction that you wanted, minus the last clause, easily capable of being easily and conveniently moved, as the Chief Judge's question to opposing counsel indicates, we'd still have a question as to what that means. I mean, this is just infinite regress. What is the meaning of capable of being easily and conveniently moved? Does it actually have to have ever been moved? Does there have to be any evidence that actually ever was moved? No, presumably not. But it has to be something that could be moved. I would think that would be the natural construction of the construction. Well, the first response, Your Honor, is I think, yes, I think that is a problem. Meta-construction, I agree, is often a problem in claim construction cases. And that's one of the reasons why you shouldn't just eliminate the last phrase from our proposed construction, that that last phrase is actually central to understanding what distinguishes devices like a mobile phone that are meant to be traveling from place to place and used in different places, and an old-fashioned landline with a cord, which, yeah, you could pick up and move, but which isn't a mobile phone. That last clause would throw out my portable generator. Your Honor, I'm not sure that's right, because I think a portable generator is designed to be used in different locations. But I agree that it would make a hard question. And if there were a dispute, if this were a case about a portable generator, I can imagine a facts dispute going into the question of trial. But in this case, the dispute is about the scope of the claims, and that is a dispute that the district court, not the jury, was supposed to have resolved. Thank you, Your Honor. We thank both parties, and the case is submitted, and we're going to take a brief recess. All rise.